# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **GARY S. HULL,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:08cv00022 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant. | ) | UNITED STATES MAGISTRATE JUDGE |

## *I. Background and Standard of Review*

The plaintiff, Gary S. Hull, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2008).   Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B).  As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards.  *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th  Cir. 1966).  "'If there is evidence to

Case 2:08-cv-00022-JPJ-PMS   Document 16   Filed 04/24/09   Page 1 of 22   Pageid#: 66

justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hull protectively filed his application for DIB on June 14, 2006, alleging disability as of December 1, 2005, due to degenerative and bulging discs in the lower back and neck, right ankle weakness resulting from ankle surgery, as well as back and neck problems. (Record, ("R."), at 50, 53-55, 63, 86, 96.) The claim was denied initially and upon reconsideration. (R. at 36-38, 40, 41-43.) Hull then requested a hearing before an administrative law judge, ("ALJ"). (R. at 44.) The ALJ held a hearing on September 12, 2007, at which Hull was represented by counsel. (R. at 375-410.)

By decision dated October 22, 2007, the ALJ denied Hull's claim. (R. at 16-27.) The ALJ found that Hull met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2010. (R. at 18.) The ALJ also found that Hull had not engaged in substantial gainful activity since December 1, 2005. (R. at 18.) The ALJ found that the medical evidence established that Hull suffered from severe impairments, namely obesity, low back pain, a herniated nucleus pulposus with possible radiculopathy, status post cervical surgery, cervical pain, gout, high blood pressure and allergies, but she found that Hull did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18-21.) The ALJ also found that Hull had the

residual functional capacity to perform light work[1] that did not require overhead lifting, overhead reaching on a regular basis, climbing or working at heights or with dangerous machinery, which allowed for a sit/stand option, required fine manipulation of the left hand up to only one-third of the time and allowed for a clean environment. (R. at 21.)  Therefore, the ALJ found that Hull was unable to perform any of his past relevant work. (R. at 25.)  Based on Hull's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Hull could perform, including jobs as a storage facility rental clerk, a retail marker and a parking lot attendant.  (R. at 26.)  Thus, the ALJ found that Hull was not under a disability as defined under the Act at any time through the date of her decision and was not eligible for benefits.  (R. at 26-27.)  *See* 20 C.F.R. § 404.1520(g) (2008).

After the ALJ issued her decision, Hull pursued his administrative appeals, (R. at 12), but the Appeals Council denied his request for review. (R. at 6-9.)  Hull then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2008). This case is before the court on Hull's motion for summary judgment filed January 2, 2009, and on the Commissioner's motion for summary judgment filed January 23, 2009.

## II. *Facts* & Analysis

Hull was born in 1953, which, at the time of the ALJ's decision, classified him

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds.  If someone can perform light work, he also can perform sedentary work.  *See* 20 C.F.R. § 404.1567(b) (2008).

-3-

as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d).[2] (R. at 53.)  He has four years of college instruction[3] in the field of education and past relevant work experience as a Virginia State Trooper.  (R. at 64, 69.)  Hull testified that he underwent cervical disc surgery in April 2004, and was off work for four or five months before returning for approximately a year.  (R. at 382, 384.)  It was at that time, he stated that he felt, due to back problems he had been experiencing for 15 to 20 years, it was no longer safe for him to perform his job. (R. at 382.)  Hull testified that he could sit for up to 15 minutes before experiencing significant burning in his legs.  (R. at 397.)  He stated that moving around for approximately 15 minutes relieved such pain, but not completely.  (R. at 397.)  He stated that he could stand for approximately 15 minutes before experiencing significant pain.  (R. at 397.)  Hull stated that he when tried to help his wife wash dishes, his legs would begin to burn and he would experience numbness down the backs of them after a few minutes.  (R. at 398.)  He stated that he took Tylenol and Motrin for pain, and occasionally hydrocodone if the pain was very bad.  (R. at 398-99.)  However, Hull testified that he did not have a current prescription for hydrocodone, and took medication that remained from a 2004 prescription.  (R. at 398-99.)  Hull estimated that he would lie down or lie in a recliner for a total of approximately three to four hours over a nine-hour period during the day.  (R. at 399.)  He stated that he had last seen Dr. Smith, a neurosurgeon, approximately a year prior to the hearing, and was informed that back surgery was the only treatment that remained.  (R. at 404.)  However, Hull testified that he wanted to delay surgery as long as possible.  (R. at 404.)

---

[2]The undersigned notes that when Hull reached the age of 55 in 2008, he became a "person of advanced age."  *See* 20 C.F.R. § 404.1563(e) (2008).

[3]Hull testified that he did not receive a degree.  (R. at 403.)

-4-

Hull testified that he experienced numbness and burning in his neck with reaching. (R. at 400.) He also testified that he experienced tingling down his left arm. (R. at 400.) He stated that rolling coins for 10 to 15 minutes would cause burning and tingling down his arm. (R. at 400-01.) Hull testified that he needed his wife's help to get out of his car after returning home from work on several occasions. (R. at 401.) He testified that he also experienced pain down his left arm and into his fingers, as well as soreness and weakness. (R. at 401-02.)

Hull also testified that he suffered from gout, mostly in his right foot. (R. at 402.) He stated that he took medication for this condition, but that he still experienced flare-ups that caused sharp pain and burning which prevented weight bearing. (R. at 403.)

James Williams, a vocational expert, also was present and testified at Hull's hearing. (R. at 405-10.) Williams classified Hull's past work as a state trooper as medium work[4] with no transferrable skills. (R. at 405.) Williams was asked to assume a hypothetical individual of Hull's age, education and work history who could perform light work that did not require any overhead lifting, overhead reaching on a regular basis, climbing, working around heights or with dangerous machinery due to hand numbness, who had a mild reduction in the use of the nondominant left hand for fine manipulation up to one-third of the time due to hand numbness, who required a sit/stand option and fairly flexible movement in place and who would need to work in a clean environment due to allergies. (R. at 406-07.) Williams testified that such

---

[4]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2008).

an individual could perform the jobs of a storage facility rental clerk, a retail marker and a parking lot attendant, all at the light level of exertion. (R. at 407.) Williams testified that the same individual, but who had to rest two hours during the work day, could perform no jobs. (R. at 407-08.)

In rendering his decision, the ALJ reviewed medical records from Norton Community Hospital; Dominion Health and Fitness; Dr. Danny A. Mullins, M.D.; Highlands Neurosurgery, P.C.; Wellmont Holston Valley Medical Center; Dickenson Community Hospital; Cardiovascular Associates, P.C.; Dr. Woodrow W. Reeves Jr., M.D.; Dr. Norman C. Ratliffe, M.D.; Blue Ridge Neuroscience Center, P.C.; Dr. Michael Hartman, M.D., a state agency physician; Dr. Anil Agarwal, M.D.; Dr. Rimon Ibrahim, M.D.; Dr. Richard Surrusco, M.D., a state agency physician; Dickenson Medical Clinic; and Mays Sleep Disorders. Hull's counsel also submitted medical records from Dr. Ken Smith, M.D., to the Appeals Council.[5]

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and (5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds

---

[5]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 6-9), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Case 2:08-cv-00022-JPJ-PMS   Document 16   Filed 04/24/09   Page 6 of 22   Pageid#: 71

conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2008).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Hull argues that the ALJ erred by failing to find that his impairment(s) met or equaled the medical listing for disorders of the spine, found at 20 C.F.R. § 1.04(A). (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 6-8.) Hull also argues that the ALJ erred by failing to give appropriate credence to his testimony and properly assess the effect of pain on his ability to perform substantial gainful activity. (Plaintiff's Brief at 9-12.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether

-7-

the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if she sufficiently explains her rationale and if the record supports her findings.

Hull argues that the ALJ erred by failing to find that his impairment(s) met or equaled the medical listing for disorders of the spine, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04(A). (Plaintiff's Brief at 6-8.) For the following reasons, I disagree. To meet § 1.04(A), a claimant must suffer from either a herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis or vertebral fracture, resulting in compromise of a nerve root or the spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A) (2008). It is well-settled that a claimant must prove that he meets *all* of the requirements of a listing. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

-8-

Hull has a history of severe cervical spine and lumbar spine problems. On April 30, 2004, he underwent an anterior cervical disckectomy and fusion at the C5-6 level with ulnar allograft and anterior plating for left C5-6 disc extrusion with left C6 radiculopathy. (R. at 171-78.) MRIs of the cervical spine and lumbar spine were performed on July 6, 2006. (R. at 268-71.) The MRI of the cervical spine showed broad-based disc osteophyte complex with moderate canal stenosis and moderate to severe left neural foraminal narrowing at the C4-5 level. (R. at 270.) It also showed a small central disc osteophyte complex with slight ventral cerebrospinal fluid effacement and mild bilateral neural foraminal narrowing at the C6-7 level. (R. at 270.) The MRI of the lumbar spine showed a central disc extrusion with slight inferior and superior migration of disc material at the L4-5 level. (R. at 271.) It also showed moderate impression on the thecal sac abutting the descending L5 root and likely mildly compressing the L5 level on the right. (R. at 271.) The MRI showed mild right neural foraminal narrowing at the L4-5 level. (R. at 271.) On July 13, 2006, Hull saw Dr. Ken W. Smith, M.D., a neurosurgeon, for follow-up of lower lumbar pain, bilateral extremity pain and cervical pain. (R. at 228-31.) Dr. Smith noted that Hull benefitted from a home exercise program. (R. at 229.) After having undergone conservative therapies, Hull rated his pain as a four on a 10-point scale, with 10 being the worst pain. (R. at 229.) Dr. Smith noted that Hull was in no acute distress. (R. at 229.) Radial and pedal pulses were palpable bilaterally, and there was no edema of the lower extremities. (R. at 229.) A musculoskeletal examination revealed a nonantalgic gait, mild cervical paraspinous muscle contractions and tenderness of the mid-lumbar spine, but no misalignment, asymmetry, crepitation, tenderness, masses, deformities or effusions of the upper or lower extremities was noted. (R. at 229.) Examination of Hull's head and neck revealed flexion limited to 60 degrees, extension limited to 20 degrees, left rotation limited to 55 degrees and

-9-

right rotation limited to 60 degrees. (R. at 229.) Dr. Smith noted no limitation of motion of the upper or lower extremities, and straight leg raise testing was negative bilaterally. (R. at 229.) He noted increased tone of the left trapezius musculature and increased tone of the right paraspinal musculature. (R. at 229-30.) Hull's strength was 5+, tone was normal, and no atrophy was noted in the head, neck or upper or lower extremities. (R. at 230.) Hull's sensation was intact to light touch and pinprick in the upper and lower extremities. (R. at 230.) Hull's deep tendon reflexes were rated as follows: biceps 1+; triceps 1+; brachioradialis 1+; knee jerks 2+; and ankle jerks 2+. (R. at 230.) All of Hull's reflexes were symmetric. (R. at 230.) Dr. Smith noted the findings contained in the July 6, 2006, MRIs of the cervical and lumbar spines. (R. at 230.) He diagnosed Hull with cervical spondylosis without myelopathy, most pronounced at the C4-5 level; cervical herniated nucleus pulposus without myelopathy at the C4-5 level on the left; cervical radiculopathy at the C6-7 level on the left, mixed; lumbar herniated nucleus pulposus at the L4-5 level; lumbar stenosis and moderate central canal stenosis at the L4-5 level; lumbar degenerative disc disease at the L4-5 and L5-S1 levels; chronic low back pain; and bilateral leg pain and numbness with no specific dermatomal distribution. (R. at 230.) Dr. Smith recommended that Hull undergo a cervical myelogram and postmyelographic CT scan with flexion and extension and a dynamic lumbar myelogram and postmyelographic CT scan with flexion and extension. (R. at 230-31.)

The lumbar myelogram, performed on July 25, 2006, showed anterior and bilateral lateral extradural defects at the L4-5 level of Hull's spine. (R. at 346.) It also showed central canal stenosis and bilateral lateral recess stenosis, as well as bilateral L5 nerve root compression. (R. at 346.) The lumbar CT scan showed a broad-based disc protrusion at the L4-5 level of Hull's spine and mild posterior ligamentous

thickening causing moderately severe central canal stenosis and severe bilateral lateral recess stenosis.  (R. at 346.)  Dr. Thomas F. Pugh, M.D., who read the myelogram and CT scan, noted that there had been progression of the central canal stenosis and bilateral lateral recess stenosis at the L4-5 level compared to the previous CT myelogram dated March 31, 2004.  (R. at 347.)  A cervical myelogram performed the same day, showed anterior and left lateral defect at the C4-5 level and a small lateral defect at the C5-6 level on the left, which had dramatically improved since the March 31, 2004, preoperative myelogram.  (R. at 347.)  A CT of the cervical spine  showed a residual/recurrent bony foraminal stenosis at the C5-6 level on the left with probable left C6 nerve root compression.  (R. at 349.)  It also showed a disc protrusion/posterior osteophytic ridge at the C4-5 level asymmetric to the left laterally.  (R. at 349.)  There was left foraminal stenosis and left C5 nerve root compression, which Dr. Pugh opined had likely progressed compared to the March 31, 2004, CT scan.  (R. at 349.) Finally, this CT scan revealed a minor degenerative disc protrusion at the C6-7 level of the spine.  (R. at 349.)

On August 10, 2006, Dr. Smith again saw Hull for follow-up of posterior cervical pain, left upper extremity numbness, low back pain and bilateral lower extremity pain and numbness.  (R. at 339-42.)  Dr. Smith noted that, over the previous four months, Hull had noted frequent episodes of left upper extremity numbness, which Hull described as tingling along the area between the left bicep and tricep musculature with radiation into the dorsum of the left forearm and thumb, index and long fingers of the left hand.  (R. at 339.)  Hull stated that this numbness was associated with use of the left hand.  (R. at 339.)  He denied left upper extremity pain or weakness or any symptoms affecting the right upper extremity.  (R. at 339.)  Dr. Smith also noted Hull's longstanding history of sporadic low back pain, left hip

-11-

discomfort and left leg pain dating back to the mid-1990s. (R. at 339.) However, Hull had noted progressive worsening of this low back pain with radiation into the left hip and left lateral thigh over the previous year. (R. at 339.) Hull reported tightness in the lumbar region associated with numbness of the bilateral thighs with walking short distances. (R. at 339.) He noted that the pain and numbness typically would ease within several minutes of discontinuing the activity. (R. at 339.) Hull denied lower extremity weakness or gait abnormalities, as well as any urinary or fecal incontinence. (R. at 339-40.)

Dr. Smith again noted that Hull benefitted from a home exercise program. (R. at 340.) Hull stated that he was in "excellent health." (R. at 340.) He again rated his pain as a four due to the use of conservative therapies. (R. at 340.) Dr. Smith noted that Hull was in no acute distress, and his gait was nonantalgic. (R. at 341.) Dr. Smith performed another physical examination, which revealed the same findings as the previous examination of July 13, 2006. (R. at 341.) He diagnosed Hull with cervical spondylosis without myelopathy at the C4-5 and C5-6 levels; cervical herniated nucleus pulposus without myelopathy at the left C4-5 level; a small central protrusion at the C6-7 level; cervical radiculopathy at the left C6-7 level, mixed; lumbar herniated nucleus pulposus at the L4-5 level; lumbar stenosis with moderate central canal stenosis at the L4-5 level; lumbar degenerative disc disease at the L4-5/L5-S1 level; chronic low back pain; and bilateral leg pain/numbness with no specific dermatomal distribution. (R. at 342.) Dr. Smith recommended continuation of a routine home exercise program for prevention of future complications. (R. at 342.) However, he noted that if Hull's symptoms persisted despite treatment, he would consider proceeding with a lumbar decompression and disckectomy at the L4-5 level. (R. at 342.)

-12-

On August 11, 2006, Dr. Michael J. Hartman, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Hull could perform light work.  (R. at 291-96.)  Dr. Hartman further found that Hull could occasionally balance, stoop, kneel, crouch and crawl, and that his ability to reach in all directions, including overhead, was limited.  (R. at 293.)  He imposed no visual or communicative limitations, but he found that Hull should avoid even moderate exposure to hazards such as machinery and heights.  (R. at 293-94.)  Dr. Hartman noted Hull's allegations that he had numbness and pain in his left leg and back and that his back went out at times.  (R. at 296.)  He further noted Hull's allegations that he was limited in his abilities to stand, walk, lift, carry items, bend, sit, stoop and kneel.  (R. at 296.)  Dr. Hartman noted the MRIs of the lumbar spine and cervical spine from July 2006.  (R. at 296.)  He found Hull's subjective allegations to be partially credible.  (R. at 296.)

On February 7, 2007, Dr. Richard Surrusco, M.D., another state agency physician, completed a Physical Residual Functional Capacity Assessment, making the same findings as Dr. Hartman.  (R. at 310-16.)  Dr. Surrusco also noted the lumbar and cervical spine MRIs from July 2006, and he found Hull's subjective allegations to be partially credible.  (R. at 315-16.)

By letter dated February 25, 2008, Dr. Smith opined that Hull's impairment(s) met the medical listing for disorders of the spine, found at § 1.04.  (R. at 367.)  This letter did not contain any clinical findings to support Dr. Smith's opinion.

-13-

*A.  Cervical Spine Impairment*

Although Hull's cervical spine impairment meets some of the requirements of § 1.04(A), it does not meet them all.  For instance, the diagnostic imaging evidence shows that Hull suffers from a herniated nucleus pulposus at the C4-5 level of the cervical spine on the left.  (R. at 230, 270, 349.)  Also, the diagnostic imaging evidence shows that this herniated nucleus pulposus results in compromise of a nerve root.  In particular, a CT scan performed on July 25, 2006, showed left foraminal stenosis and left C5 nerve root compression. (R. at 349.)  However, it is questionable whether Hull can show that any such nerve root compression is characterized by neuro-anatomic distribution of pain.  Hull testified at his hearing and has informed Dr. Smith that he experiences numbness and burning in his neck with reaching, as well as tingling down his left arm.  (R. at 339, 400-02.)  Although he testified that he experiences pain down his arms and into his fingers, as well as soreness and weakness in his arm, he informed Dr. Smith in August 2006 that he had no upper extremity pain or weakness.  (R. at 339, 401-02.)  Thus, it appears that Hull's complaints focused on numbness and tingling as opposed to pain.  The record does support a finding of limitation of motion of the cervical spine.  Examinations of Hull's head and neck by Dr. Smith on July 13, 2006, and again on August 10, 2006, revealed flexion limited to 60 degrees, extension limited to 20 degrees, left rotation limited to 55 degrees and right rotation limited to 60 degrees.  (R. at 229, 341.)  Moreover, the evidence of record does not support a finding of motor loss accompanied by either sensory or reflex loss.  When Dr. Smith examined Hull on July 8, 2006, and again on August 10, 2006, Hull's strength was rated at 5+, which denotes full strength.  (R. at 230, 341.) Dr. Smith noted no atrophy of the neck or upper extremities in July or August 2006. (R. at 230, 341.)  Moreover, during the same examinations, Hull's sensation to light

-14-

touch and pinprick was intact in both the upper and lower extremities. (R. at 230, 341.) Finally, the record shows that Hull experienced no reflex loss. During the July and August 2006 examinations by Dr. Smith, Hull's deep tendon reflexes were rated as follows: biceps 1+; triceps 1+; brachioradialis 1+; knee jerks 2+; and ankle jerks 2+.[6] (R. at 230, 341.) All of these reflexes were symmetric. (R. at 230, 341.) Thus, while Hull can meet most of the requirements of § 1.04(A), he simply cannot meet them all. It is well-settled, however, that in order to meet a medical listing, an individual's impairment must meet all of the requirements of that listing. *See Zebley*, 493 U.S. at 530.

With regard to Dr. Smith's February 25, 2008, opinion that Hull's impairments met § 1.04(A), I note that because the Appeals Council considered this evidence in reaching its decision not to grant this review, this court also should consider it in determining whether substantial evidence supports the ALJ's findings. *See Wilkins*, 953 F.2d at 96. I first note that it is the ALJ who is responsible for determining whether a claimant's impairments meet the requirements of a listed impairment. *See* 20 C.F.R. § 404.1527(e)(2) (2008). In addition, the court notes that Dr. Smith provided no explanation as to how and why he reached this conclusion and, as explained above, his treatment notes before the court do not support such a conclusion. Finally, Dr. Smith's letter, which is dated more than four months after

---

[6]Deep tendon reflexes are often rated according to the following scale: 0 = absent; 1+ = trace, or seen only with reinforcement; 2+ = normal; 3+ = brisk; 4+ = nonsustained clonus (i.e., repetitive vibratory movements); and 5+ = sustained clonus. *See* http://www.neuroexam.com/content.php?p=31. Moreover, deep tendon reflexes are normal if they are 1+, 2+ or 3+ unless they are asymmetric or there is a dramatic difference between the arms and the legs. *See* www.neuroexam.com. Reflexes rated as 0, 4+ or 5+ are usually considered abnormal. *See* www.neuroexam.com. The reflex relevant to the C5 and C6 nerve roots is the biceps reflex. *See* www.neuroexam.com.

Hull's hearing, does not specify the time period for which Dr. Smith concluded that his impairment(s) met § 1.04(A). Thus, it is not clear to the court that Dr. Smith's opinion is even relevant to the ALJ's disability determination in this case. If this opinion is intended to relate to the relevant time period, Hull has provided no explanation as to why it was not presented to the ALJ.

For all of the above-stated reasons, I find that substantial evidence supports the ALJ's finding that Hull's cervical spine impairment does not meet the medical listing for disorders of the spine, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04(A).

## B. Lumbar Spine Impairment

The diagnostic imaging evidence with regard to Hull's lumbar spine impairment shows that he suffers from a herniated nucleus pulposus at the L4-5 level of the spine. (R. at 230, 268, 342, 345-46.) However, diagnostic imaging evidence does not unequivocally show that this herniated nucleus pulposus resulted in any nerve root compromise. Moreover, while Hull has complained of difficulty sitting and/or standing for longer than 15 minutes without interruption due to significant burning and numbness in his legs, this is not evidence of neuro-anatomic distribution of *pain*. (R. at 397.) Additionally, there is no evidence of limitation of motion of the lumbar spine contained anywhere in the record. When Dr. Smith performed physical examinations of Hull in July and August 2006, he did not evaluate Hull's lumbar spine range of motion. (R. at 230, 341.) However, he did note on both occasions that Hull did not walk with an antalgic gait, he noted no difficulties in Hull's ability to get around and he placed no restrictions on Hull's activities. (R. at 230, 341.) As

-16-

mentioned above with regard to Hull's cervical spine impairment, Hull's strength was rated as 5+, his reflexes were normal and symmetric and his sensation to light touch and pinprick was intact in both the upper and lower extremities. (R. at 230, 341.) Dr. Smith noted no atrophy of the lower extremities in both July and August 2006. (R. at 229, 341.) Finally, § 1.04(A), when dealing with the lumbar spine, requires an additional finding of positive straight leg raise testing. However, Dr. Smith noted bilateral negative straight leg raise testing in both July and August 2006. (R. at 230, 341.)

For all of the above-stated reasons, I find that substantial evidence supports the ALJ's finding that Hull's lumbar spine impairment does not meet the medical listing for disorders of the spine, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04(A).

Hull also argues that the ALJ erred in her pain analysis and credibility analysis. I disagree. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

-17-

> Although a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers. ...

76 F.3d at 595. "[P]ain itself can be disabling, and it is incumbent upon the ALJ to evaluate the effect of pain on a claimant's ability to function." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). Evidence of a claimant's activities as affected by the pain is relevant to the severity of the impairment. *See Craig*, 76 F.3d at 595. Furthermore, an ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great weight when it is supported by the record. *See Shively*, 739 F.2d 987, 989-90 (4th Cir. 1984). "[S]ubjective evidence of pain cannot take precedence over objective medical evidence or the lack thereof." *Parris v. Heckler*, 733 F.2d 324, 327 (4th Cir. 1984). As in the case of other factual questions, credibility determinations as to a claimant's testimony regarding his pain are for the ALJ to make. *See Shively*, 739 F.2d at 989-90. To hold that an ALJ may not consider the relationship between the objective evidence and the claimant's subjective testimony as to pain would unreasonably restrict the ALJ's ability to meaningfully assess a claimant's testimony.

Here, the ALJ found that Hull's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but she further found that Hull's statements regarding the intensity, persistence and limiting effects of those symptoms were not entirely credible. (R. at 22.) In particular, the ALJ noted a lack of any intensive or extensive treatment. (R. at 24.) For instance, the record shows that the only lumbar epidural steroid injection was performed in 1996. (R. at 229,

-18-

340.)  Moreover, The ALJ concluded that severe functional limitations were not supported by the record, noting that Hull took no prescription pain medication, nor had any been prescribed to him since 2004.  (R. at 24.)  At the hearing, Hull testified that he took hydrocodone when his pain was severe, but he noted that he did not have a current prescription.  (R. at 398-99.)  Instead, he stated that he continued to take hydrocodone that was prescribed in 2004, noting that he took this medication only approximately a couple of times per year.  (R. at 398-99.)  The ALJ found Hull's allegations of disabling pain further undermined by his activities of daily living, which include independent personal care, with some difficulty putting on shoes and socks, preparation of simple meals, performance of household chores, including laundry, shopping, mowing the lawn with a riding mower and taking short walks.  (R. at 24.)  Hull also indicated that he read and watched television daily without difficulty and that he went fishing occasionally for short periods of time.  (R. at 24.)  He also stated that he visited family twice weekly and attended sporting events weekly.  (R. at 24.)  The undersigned agrees that all of this evidence tends to cut against Hull's argument that he suffers from disabling pain.  In addition to this evidence recited by the ALJ in her decision, I note that when Hull saw Dr. Smith in July and August 2006, he rated his pain as only a four on a 10-point scale with the use of conservative therapies.  (R. at 229, 340.)  It also is important to note that Dr. Smith noted no limitation of motion of Hull's upper or lower extremities, and he never placed any restrictions on Hull's abilities.  (R. at 229, 341.)

All of this being said, I find that the ALJ thoroughly considered Hull's allegations of pain and its effect on his ability to work.  However, for all of the reasons recited by the ALJ in her decision, and those cited above, the objective evidence does not support Hull's allegations regarding the extent of his pain and its effect on his

ability to perform work. Moreover, it is the province of the ALJ to assess the credibility of a witness or claimant. *See Hays*, 907 F.2d at 1456; *Taylor*, 528 F.2d at 1156. Furthermore, "[b]ecause [s]he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively*, 739 F.2d at 989. Ordinarily, this court will not disturb the ALJ's credibility findings unless "it appears that her credibility determinations are based on improper or irrational criteria." *Breeden v. Weinberger*, 493 F.2d 1002, 1010 (4th Cir. 1974). For the above-stated reasons, the undersigned finds that the ALJ's credibility determination was not based on "improper or irrational criteria." That being the case, great weight should be accorded to the ALJ's credibility findings.

Lastly, the undersigned finds that the ALJ's physical residual functional capacity assessment is supported by substantial evidence. Specifically, it is supported by the findings of both state agency physicians, Dr. Hartman and Dr. Surrusco. The court notes that Hull's treating physician, Dr. Smith, never imposed any functional limitations. That being the case, it appears that the state agency physicians gave Hull every benefit of the doubt in imposing the restrictions that they did, and the ALJ did the same in accepting those findings in determining Hull's physical residual functional capacity. Nonetheless, even considering all of these limitations, the vocational expert testified that jobs existed in significant numbers in the national economy that Hull could perform. This residual functional capacity assessment is further supported by Hull's activities of daily living, as outlined previously.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now

submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the ALJ's finding that neither Hull's cervical spine impairment nor his lumbar spine impairment met the medical listing for disorders of the spine, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04(A);

2. Substantial evidence exists to support the ALJ's pain and credibility analyses;

3. Substantial evidence exists to support the ALJ's finding regarding Hull's physical residual functional capacity; and

4. Substantial evidence supports the ALJ's finding that Hull was not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Hull's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(c) (West 2006):

Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is

made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     This 24th day of April 2009.

/s/ Pamela Meade Sargent
UNITED STATES MAGISTRATE JUDGE